IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALANA L. PONCHART,

        Plaintiff,

           v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

CV 05-822-ST

FINDINGS AND RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

On February 28, 2001, plaintiff, Alana Ponchart ("Ponchart"), filed an application for disability insurance benefits under Title II of the Social Security Act. After her application was denied initially and upon reconsideration, Ponchart requested a hearing before an Administrative Law Judge ("ALJ"), which took place on March 5, 2004. The ALJ concluded that Ponchart was not disabled within the meaning of the Social Security Act. This ruling became final when the Appeals Council denied the request for review on April 13, 2005. This court has jurisdiction to

1 - FINDINGS AND RECOMMENDATION

review the decision below pursuant to 42 USC § 405(g). For the reasons set forth below, the Commissioner's ruling should be reversed and remanded for an award of benefits.

## BACKGROUND

Ponchart was born in 1961 and was 37 years old at the time of the alleged disability. Tr. 78.[1] She has her GED and completed a certificate program in office management at Trend College in 1991. Tr. 143. Prior to her alleged date of disability, she worked as an assembler in an electronics plant, a teacher, a sawyer, an in-home care giver, and in office settings as a receptionist and as a payroll clerk. Tr. 137. Her last job as a payroll clerk began on February 28, 1999. Tr. 136-37. In roughly mid-May 1999, she reduced her hours to part-time in an effort to reduce the amount of pain affecting her work performance, but finally quit on July 16, 1999, because the pain persisted. Tr. 136.

Ponchart's alleged onset date is July 16, 1999, the last day of her job as a payroll clerk. Tr. 78. The end of the relevant period is December 31, 1999, the date when her insured status expired ("DLI"). Therefore, Ponchart must establish that she was disabled on or before that date to prevail on her claim. 42 USC § 423(a)(1)(A); *see Tidwell v. Apfel,* 161 F3d 599, 601 (9th Cir 1998).

Ponchart's extensive medical records date back to at least to 1996 and are from multiple physicians, surgeons, and specialists responsible for her care at various times. Her alleged health conditions for the relevant time period include fibromyalgia, Raynaud's Syndrome, scoliosis, bilateral carpal tunnel syndrome, irritable bowel syndrome, Hepatitis C, and Chronic Obstructive

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 11).

Pulmonary Disease ("COPD").  Tr. 136, 139.  She alleges that the pain she encountered during the relevant period left her unable to work. At the hearing before the ALJ, she also stated that her irritable bowel syndrome frequently interrupts her daily activities and that her asthma is sufficiently severe to make a flight of steps a serious obstacle to her daily routine.  Tr. 624, 639-40.

Ponchart also provided evidence of non-exertional impairments.  A consultation in 1998 with Grant C. Rawlins, Ph.D., a clinical psychologist, resulted in a diagnosis of dissociative disorder, dysthemia, and panic disorder with agoraphobia.  Tr. 383.  Robert Henry, Ph.D., a psychologist, completed a Psychiatric Review Technique form based upon these assessments and concluded that Ponchart would often have difficulty completing tasks in a timely manner, would be moderately limited in the ability to complete a workday and work week without interruption from psychological symptoms, and would have moderate limitations in following detailed instructions and interacting appropriately with the public.  Tr. 405, 407-08.

## DISABILITY ANALYSIS

### I.    The Sequential Evaluation Process

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 416.920

At step one, the claimant is not disabled if the Commissioner determines that the claimant is engaged in substantial gainful activity.  *Yuckert*, 482 US at 140; 20 CFR § 416.920(b).

At step two, the claimant is not disabled if the Commissioner determines that the claimant has no "medically severe impairment or combination of impairments." *Yuckert*, 482 US at 140-41; 20 CFR § 416.920(c).

At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 US at 140-41; 20 CFR § 416.920(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 CFR Part 404, Subpart P, Appendix 1 (Listing of Impairments).

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 CFR § 416.945(a); Social Security Ruling ("SSR") 96-8p.

At step four, the claimant is not disabled if the Commissioner determines that the claimant retains the RFC to perform work she has done in the past. 20 CFR § 416.920(e).

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform other work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR § 416.920(e) & (f); 20 CFR § 416.966. Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 US at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1098 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled.

## II. The ALJ's Decision

The ALJ found that Ponchart had "a combination of varied physical impairments . . . that is considered 'severe,'" but which did not meet or equal any of the listed impairments. Tr. 32. He also found Ponchart not to be totally credible regarding her limitations. *Id.* Based on the record, he assembled the following RFC:

> During the 6 ½ months under review, the claimant retained the residual functional capacity to perform a reduced range of light and sedentary exertional level work. Within the framework of the light exertional capacity, the claimant was not limited in standing, walking, sitting, pushing or pulling. Stooping was limited to an occasional basis. She did not have other postural limitations no manipulative/visual/communicative limitations. Due to her respiratory conditions and Raynaud's disease, she needed to avoid concentrated exposure to cold, as well as concentrated fumes, odors, dusts, gases, poor ventilation, et cetera (Exhibit 32F). She had moderate limitations to interacting appropriately with the general public.

*Id.*

Finally the ALJ determined that during the relevant time period, Ponchart could have performed two of her past jobs as a payroll clerk or as an assembler without limitation. *Id.* Based on this finding, the ALJ did not reach step five of the analysis.

## III. Standard of Review

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*, 517 US 1122 (1996) (citation omitted). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.

5 - FINDINGS AND RECOMMENDATION

42 USC § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation."  *Andrews*, 53 F3d at 1039-40.

## FINDINGS

Ponchart claims that the ALJ erred in the assessment of a variety of evidentiary matters, as well as in his construction of the hypothetical for the vocational expert.  Specifically, she challenges the rejection of the opinion of her treating physician, the opinions of the psychologists, her testimony, and the testimony of her husband, Evan Ponchart, and her mother, Ginger DuMont.  Ponchart also claims that the ALJ did not properly consider her combined impairments in constructing the RFC.  Finally, she claims that the ALJ presented an incomplete and misleading hypothetical to the vocational expert at the hearing.

### I.    Rejection of Treating Physician's Opinion

Ponchart contends that the ALJ erred by rejecting the opinion of her treating physician, Randall E. Currier, M.D., set forth in his February 16, 2004 letter that Ponchart "continues to be incapable of sedentary work or light work at this time" and that "these limitations applied for a significant amount of time prior to her first visit with me in April 2000."  Tr. 605.

The Commissioner has the discretion to reject the testimony of a treating doctor.  Where the treating doctor's opinion is contradicted by another doctor, it may not be rejected without

providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted). If the opinion is not contradicted, then it may only be discredited for "clear and convincing reasons." *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002) (citation omitted).

The ALJ cited the opinion proffered by Ponchart's former treating physician, Stephen Foutz, M.D., on July 28, 1998, as "counterpoint to the reporting of Dr. Currier." Tr. 29. That opinion was given in response to a prior disability application by Ponchart filed on June 30, 1998, alleging disability from scoliosis, lupus, Reynaud's syndrome, colectomy, ileostomy, and back pain, and other impairments. Tr. 25, 87. Dr. Foutz opined that Ponchart "appears to be fully employable for any occupation for which she is mentally capable, consistent with high school graduate level." Tr. 362. Ponchart contends that this opinion appears to pertain solely to her preparation for and recovery from the removal of her ileostomy, which itself was a result of a fall from a cliff in 1996.

Dr. Foutz's opinion does focus primarily on the specifics of Ponchart's fall, subsequent hospitalization and treatment, and predates the alleged onset date in this case by over a year. However, some of the impairments alleged by Ponchart dating back to July 1999 addressed by Dr. Currier, such as scoliosis, Reynaud's syndrome, and back pain, also were alleged by Ponchart in support of her prior disability claim addressed by Dr. Foutz. Even if Dr. Foutz was not privy to the full range of impairments that are at issue in the present case, such as depression or carpal tunnel syndrome, his opinion does conflict with the opinion of Dr. Currier at least with respect to the overlapping impairments. Thus, the ALJ was required to provide specific and legitimate reasons to reject Dr. Currier's opinion.

7 - FINDINGS AND RECOMMENDATION

The ALJ gave three reasons for rejecting Dr. Currier's opinion. He found it "problematic not only because it is retrospective rather than contemporaneous, and contain[s] some errors, but also because it is sprinkled with conditional words and phrases such as 'probably,' 'often results,' and 'may,' demonstrating that the doctor is speculating.." Tr. 28. None of these reasons survives scrutiny.

It is well established in this circuit that retrospective opinions are legitimate. *Smith v. Bowen*, 849 F2d 1222, 1225 (9th Cir 1988). As the Commissioner argues, where the retrospective diagnosis is contrary to contemporaneous medical records and opinions, the ALJ may properly reject the retrospective opinion. *Magallanes v. Bowen*, 881 F2d 747, 754 (9th Cir 1989). The problem is that the ALJ points only to the contrary opinion of Dr. Foutz. Dr. Foutz' opinion of July 1998, about a year before the alleged onset date, is no more contemporaneous than Dr. Currier's opinion, which is based on treatment beginning in April 2000, about eight months after the alleged onset date and only four months after the DLI. The record contains no contrary contemporaneous diagnoses because Ponchart did not see any doctors for roughly 21 months from July 1998 to April 2000.

The Commissioner also argues that retrospective diagnoses are "notoriously unreliable," citing *Vincent v. Heckler*, 739 F2d 1393, 1395 (9th Cir 1984). However, the full quote from *Vincent* is that "[a]fter-the-fact psychiatric diagnoses are notoriously unreliable." Here Dr. Currier made no assessment of Ponchart's mental state nor suggested that her pain was somehow psychosomatic. Instead he discussed Ponchart's physical conditions and related symptoms and conveyed a summary of her past medical history. The record contains substantial evidence supporting Dr. Currier's retrospective diagnosis. His records and the records of

referred physicians are extensive and detailed. Within a year after April 2000, a broad variety of tests had been performed which would have given Dr. Currier a fairly accurate understanding of Ponchart's health. As Ponchart points out, the conditions she alleges (particularly fibromyalgia, but also her carpal tunnel syndrome and scoliosis) are degenerative. Her state of health in April 2000 would not be so radically different than her health at the alleged onset date or the DLI that a retrospective diagnosis would be incredible or suspicious. Accordingly, the retrospective nature of Dr. Currier's opinion is not a sufficient reason to reject it.

The ALJ also felt that Dr. Currier's letter is speculative, pointing to a variety of conditional phrases. Most of these phrases are used to describe the scope of symptoms that a particular condition can exhibit. For example, the use of "often results" is related to the symptoms that "often result" when a patient has marked levoscoliosis. Tr. 605. Dr. Currier goes on to state that Ponchart has "history of chronic myofascial pain of the neck and shoulders which may be related to levoscoliosis." *Id*. This condition "clearly would have been present probably many, many years prior" to the diagnosis in February 2001. *Id*. When read in context, the use of conditional terms does not strip Dr. Currier's opinion of certainty. He identified a source of "chronic pain" and indicated that it "clearly" has been in existence for "probably" many years before the diagnosis of the problem. The ALJ's characterization of the opinion as "speculative" does not utilize an interpretation that withstands a four-corners reading of the text.

The ALJ also stated that:

> Dr. Currier notes in summary that the claimant has multiple medical conditions that "can" result in disability rather than stating that the claimant has multiple medical conditions that "did" result in disability during the period under review.

Tr. 28.

9 - FINDINGS AND RECOMMENDATION

However, the summary to which the ALJ refers reads as follows:

> In summary, she has multiple medical conditions that can result in disability to the point of causing inability to sustain either sedentary or light work. These were clearly present well before April of 2000.

Tr. 605.

This summary must be read in conjunction with the first paragraph of Dr. Currier's letter which reads:

> I have reviewed Alana's medical records in light of her upcoming hearing for Social Security disability. It is my opinion that she continues to be incapable of sedentary work or light work at this time. I also believe these limitations applied for a significant amount of time prior to her first visit with me in April 2000.

*Id.*

It is difficult to accept the ALJ's interpretation of Dr. Currier's summary. Dr. Currier does not say that Ponchart "might have fibromyalgia," but says that she "has fibromyalgia." He does not say that "she might be experiencing pain," but says that "she is experiencing pain." Dr. Currier accurately states how a condition can exhibit itself. The long record of tests, referrals, and consultations attests to the fact that Ponchart's conditions have in fact resulted in symptoms that are generally referenced in Dr. Currier's letter as potential outcomes. Dr. Currier states in no uncertain terms that Ponchart has suffered limitations in her ability to do even sedentary work since her first visit to him, and that in his opinion the limitations would have existed for a significant time period prior to that first visit. He does not speculate, but instead concludes. Rejection of Dr. Currier's opinion as mere speculation was erroneous.

10 - FINDINGS AND RECOMMENDATION

Finally, the ALJ took issue with Dr. Currier's accuracy in reporting Ponchart's conditions and reported that his letter and the Loan Discharge form had "some errors." Tr. 28. As the ALJ noted, Dr. Currier did misquote Dr. Marchini's August 17, 2000 assessment of Ponchart's COPD as "moderate to marked," when the assessment actually states "moderate to severe." However, as terms of art in the medical community, "marked" and "severe" are essentially synonymous and confusing them is, at most, a harmless error. Dr. Currier also cited lupus as one of Ponchart's conditions on the Loan Discharge Form, and this diagnosis has been called into question by other physicians. Tr. 510. This alone, however, does not provide a legitimate reason to reject his opinion, especially when Dr. Currier did not enumerate lupus as one of the causes of Ponchart's impairments in his 2004 letter opinion.

In short, substantial evidence does not support the conclusion that Dr. Currier's letter opinion is intentionally misleading or materially inaccurate. Accordingly, the rejection of Dr. Currier's opinion was legal error.

## II.    Ponchart's Credibility

Ponchart testified that in 1999, as now, she got headaches about three times a week for an hour or two at a time, and the only way to stop them was to lie down in a very dark room and take a medication prescribed by Dr. Currier. Tr. 633. In 1999, she needed help buttoning her clothes and doing chores at home. Tr. 630. Her mother, her husband, and her son all helped. Tr. 631. She had bad fatigue and took daily naps. Tr. 638. Since 1996, due to diarrhea from her shortened colon, she has had to go to the bathroom as often as every 15 to 20 minutes. Tr. 640. She is depressed and currently takes Paxil, which does not really help. *Id*. Both in 1999 and presently, she can sit for 30 to 60 minutes and stand 20 to 30 minutes at a time. Tr. 641. She has

to lie down due to back pain and can walk about a block before needing to rest and catch her breath. Tr. 642. She cannot lift 10 pounds. *Id*. She would not be able to do even sedentary work because she needs to lie down during the day and is relegated to the bathroom much of the time. Tr. 645. Due to pain, she often needs to be alone and lie down in a dark, quiet room. *Id*. She lies down for about 75% of the day. Tr. 653.

The ALJ rejected Ponchart's statements about her limitations as "not totally credible," citing disproportionate allegations when compared "to a medical record which demonstrates that she did not seek any medical attention for approximately one year prior to her alleged onset date and for approximately nine months thereafter," claims of medical conditions that are either unsupported by the medical record or reported as being overcome, and a history of drug use. Tr. 30.

A.  **Legal Standard**

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must: (a) "produce objective medical evidence of an impairment or impairments;" and (b) "show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F3d 1273, 1282 (9th Cir 1996) (citations omitted, emphasis in the original). The claimant is only required to produce objective medical evidence of the impairment, not of the symptom itself. *Id*. The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused *some* degree of the symptom. *Id*

In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. To determine whether subjective testimony is credible, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id* at 1284 (citations omitted).

The following factors must also be considered: the circumstances under which the claimant testified, any contradictions or corroborations, the claimant's prior work record, the nature of any symptoms and medical treatment, her daily activities, and any other factors concerning the claimant's functional limitations and restrictions. 20 CFR § 404.1529; SSR 96-7p, 1996 WL 374186, *3. In weighing evidence of pain, the ALJ is also required to consider the "nature, location, onset, duration, frequency, radiation, and intensity of any pain," "precipitating and aggravating factors such as movement, activity, environmental conditions," "type, dosage effectiveness, and adverse side-effects of any pain medication," "treatment, other than medication, for relief of pain," "functional restrictions" and "the claimant's daily activities." SSR 88-13, 1988 WL 236011, *3-4.

"[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F2d 341, 345 (9th Cir 1991) (*en banc*) (citation omitted). "While subjective pain testimony cannot be rejected on the sole ground that it is not corroborated by objective medical evidence, the medical

13 - FINDINGS AND RECOMMENDATION

evidence is still a relevant factor in determining the severity of the claimant's pain and *its disabling effects*." *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001), citing 20 CFR § 404.1529(c)(2) (emphasis added).

If the ALJ finds the claimant's symptom testimony not to be credible, the ALJ '"must specifically make findings which support this conclusion" and the findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit" it. *Bunnell*, 947 F2d at 345 (internal quotations and citations omitted). If there is no evidence of malingering, the ALJ may reject symptom evidence only if he gives clear and convincing reasons, including which testimony is not credible and what facts in the record lead to that conclusion. *Smolen*, 80 F3d at 1281.

**B.    Analysis**

Because Ponchart produced medical evidence of underlying impairments consistent with her alleged pain and because there is no affirmative evidence of malingering, the ALJ's decision will be upheld on review only if the ALJ provided clear and convincing reasons for rejecting her testimony.

The ALJ's central reason for doubting Ponchart's claims is the gap in the medical records from 1998 to early 2000. At the hearing, Ponchart testified that she lost her insurance benefits when she stopped working and that she returned to a doctor as soon as her husband's job was able to extend benefits to his family. Tr. 623. A claimant's failure to obtain medical treatment when unable to afford such treatment should not impugn her credibility. *Smolen,* 80 F3d at 1284. However, the ALJ was not persuaded by Ponchart's explanation, noting that "the record does not indicate that she sought medical attention under plans for indigent, including but not

limited to the Oregon Health Plan," that she "was able to afford a pack-a-day cigarette habit," and that she did not seek medical treatment even though she earned "additional income from resuming work from February to July 1999." Tr. 30. These reasons are not clear and convincing.

The mere fact that Ponchart failed to apply for assistance under the Oregon Health Plan is not proof positive that she was sufficiently healthy not to require medical treatment. The medical record from April 2000 forward indicates, to the contrary, that she continued to suffer from impairments that started well before July 1999. It is also unclear from the record that Ponchart would have qualified for such indigent assistance since her husband was employed for most of the time during the gap in the medical record. Tr. 475. When her husband obtained health insurance through his job, Ponchart began seeing Dr. Currier and other treatment providers and received both regular treatment and extensive diagnostic testing.

Although the ALJ relies on Ponchart's smoking, the record does not reflect the cost of that habit and how it compares to the cost of medical care. Accordingly, the ALJ's conclusion that Ponchart elected to smoke instead of seeking medical treatment is mere speculation.

Ponchart's return to work in 1999 also does not support the absence of a disability. She returned to work prior to the alleged onset of disability and testified that she left her job because she was in too much pain to work. The ALJ cites the "replication" of her claims of back pain, breathing problems, fatigue, *etc*., on the prior 1999 disability application as suspicious because of her time spent working prior to the pending application. However, these symptoms are supported by objective medical evidence from April 2000 forward. The ALJ does not point to the particular claims that would be implicated by her returning to work. He also does nothing to

15 - FINDINGS AND RECOMMENDATION

cast doubt on Ponchart's claims that she could not continue work on a full-time basis due to pain, and then failed to maintain even a half-time schedule in the job in question. Moreover, this court will not fault an individual for attempting to work. If a claimant cannot work for any meaningful length of time due to impairments, it is not appropriate to cite the claimant's efforts to work as evidence against her. *See Lester*, 81 F3d at 833 ("Occasional symptom-free periods – and even the sporadic ability to work – are not inconsistent with disability.")

As further evidence of lack of credibility, the ALJ also noted that Ponchart added new impairments to her disability report dated March 15, 2001, such as seizures and bowel trouble. Tr. 136, 139. As the ALJ correctly concluded, the medical record does not support any problems with seizures after Ponchart stopped abusing drugs in 1997 (Tr. 383), and Dr. Currier does not mention any seizure condition. Thus, Ponchart's reference to seizures could be evidence of exaggeration. But the other impairments she listed are fully supported by the medical record. In particular, her bowel trouble is supported by objective evidence of a colostomy and partial removal of her colon. Tr. 589. Rather than explain how Ponchart's reference to those additional impairments indicate a lack of credibility, the ALJ merely stated that Ponchart's history of polysubstance abuse "suggests patterns of duplicity/evasion/misdirection." Tr. 30. However, Ponchart has not used illegal drugs since 1997 and not one of the treating sources ever suggested that Ponchart was guilty of duplicity, evasion, or misdirection. To the contrary, the medical record before and after the contested period is peppered with positive comments regarding her demeanor and attitude. *See e.g.,* Tr. 351, 425, 481. In addition, the testimony of her family is consistent with her own discussion of her limitations. Tr. 124-5, 128, 169. Although the ALJ

may have cause to distrust the testimony of drug users, such distrust is wholly misplaced in this case.

The Commissioner also argues that Ponchart's robust daily activities contradict her testimony. However, the ALJ's decision does not cite Ponchart's daily activities as one of the reasons for discrediting Ponchart. On appeal, the court is constrained to review only the reasons the ALJ asserts. *SEC v. Chenery Corp.*, 332 US 194, 196 (1947); *Connett v. Barnhart*, 340 F3d 871, 874 (9th Cir 2003). Even if the ALJ had given this reason, the daily activities described by Ponchart and the other witnesses do not necessarily transfer to the workplace or rise to level of using skills commonly used in workplace settings. *See Benecke v. Barnhart*, 379 F3d 587, 594 (9th Cir 2004).

In sum, the ALJ's reasons for discounting Ponchart's credibility fall far short of the "clear and convincing" standard applicable here. Indeed, his reasons provide no basis whatsoever for rejecting Ponchart's allegations concerning the extent of her impairments.

### III.     Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

17 - FINDINGS AND RECOMMENDATION

Improperly rejected evidence should be credited and an immediate award of benefits directed where

> 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman v. Apfel*, 211 F3d at 1178, quoting *Smolen,* 80 F3d at 1292.

When an ALJ improperly rejects a claimant's testimony regarding his limitations and the claimant would be deemed disabled if his testimony were credited, courts do not remand solely to allow the ALJ to make further findings regarding the testimony. *See Lester*, 81 F3d at 834, citing *Varney v. Sec'y of Health & Human Services*, 859 F2d 1396, 1401 (9th Cir 1988). Instead, the testimony is credited as a matter of law. *Id.*

Here the opinion of Ponchart's treating physician and her own testimony establish a legitimate claim for disability that is not controverted by substantial evidence. The vocational expert and the ALJ both stated that, were the evidence from Ponchart regarding her limitations credited as true, the proper conclusion would be a finding of total disability. Tr. 654. Thus, there are no outstanding issues to resolve, and it is clear from the record that the ALJ would be required to find the claimant disabled were the improperly rejected evidence credited.

Because these issues are dispositive, discussion of Ponchart's additional claims is unnecessary.

///

///

///

18 - FINDINGS AND RECOMMENDATION

## **RECOMMENDATION**

Based on the reasons set forth above, the Commissioner's final decision should be reversed and remanded for an award of benefits, and final judgment should be entered pursuant to sentence four of 42 USC § 405(g).

## **SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due September 28, 2006. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 7th day of September, 2006.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

19 - FINDINGS AND RECOMMENDATION